**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

MR. & MRS. CRAB LAKELAND INC
Florida Profit Corporation
d/b/a MR & MRS CRAB LAKELAND

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

**COMPLAINT**

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues MR. & MRS. CRAB LAKELAND INC, Florida Profit Corporation, d/b/a MR & MRS CRAB LAKELAND ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42

U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.mmcseafood.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6. Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 3770 Lakeside Village Ct, Lakeland, FL 33803 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal

access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

**PARTIES**

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a

webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Profit Corporation with a principal place of business of 3770 Lakeside Village Ct, Lakeland, FL 33803 (hereinafter "Defendant's Principal Place of Business").

16. Defendant is a seafood restaurant operating under the name Mr. and Mrs. Crab, which offers a customizable seafood boil with a variety of seafood, sauces and seasoning options prepared to order. In addition to dine-in services, Defendant offers cocktails, sells it signature MMC Bottled Seasoning as a retail product, operates a customer loyalty program known as CrabFam, and provides information about its products, and services through Defendant's Website, including access to its online store for the purchase of Defendant's goods and services.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates a seafood restaurant business from its principal place of business, through which it provides customizable seafood dining experiences, retail seasoning products, and loyalty program services to its customers. Defendant's Website serves as a direct digital extension of that physical business, functioning as an online platform through which Defendant markets its menu offerings, promotes its CrabFam loyalty program, and makes its MMC Bottled Seasoning available for retail purchase to consumers. Defendant's Website is owned, controlled, and operated by Defendant in connection with its principal place of business, and the goods and services advertised and made available through Defendant's Website are inextricably linked to the operations conducted at Defendant's physical location. Through Defendant's Website, Defendant extends its commercial reach beyond its physical premises, offering goods and services to consumers nationwide. The nexus between Defendant's Website and Defendant's principal place of business is therefore firmly established, as Defendant's Website exists to promote, support, and facilitate the same goods and services that Defendant provides through its brick-and-mortar operations.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant’s Website. Since Defendant’s Website is open to the public through the internet, by this nexus Defendant’s Website is an intangible service, privilege, and advantage of Defendant’s Principal

Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. Defendant's Website functions as a direct digital extension of Defendant's physical business, serving as a primary gateway through which consumers access information about and engage with the goods and services offered at Defendant's brick-and-mortar location. Defendant's Website provides detailed information regarding Defendant's menu offerings, including customizable seafood boil options, sauces,, and cocktails, offers Defendant's MMC Bottled Seasoning for retail purchase, and allows consumers to enroll in and participate in Defendant's CrabFam loyalty program. Defendant's Website also provides contact information through which consumers may communicate with Defendant regarding its services, reservations, and other operational matters. These goods, services, and

consumer engagement features are integral to Defendant's physical business and establish a sufficiently close nexus between Defendant's Website and Defendant's principle place of business.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. April 13, 2026;

b. April 24, 2026;

c. May 09, 2026;

d. May 28, 2026;

e. June 12, 2026;

f. June 27, 2026;

g. June 27, 2026;

h. July 16, 2026 and

i. August 02, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on April 24, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the

discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in

> order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant

---

[2] 42 U.S.C. § 12188(b).
[3] 42 U.S.C. § 12188(a).
[4] Johnson, *supra* note 8.
[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).
[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business. The opportunity to explore and pre-shop the goods and services available through Defendant's Website, as well as to sign up for Defendant's CrabFam loyalty program to receive promotional offers, coupons, exclusive invitations, and birthday discounts for use in connection with Defendant's physical location, are important accommodations for visually disabled individuals because traveling outside of the home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or

accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of

making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Incorrect Alt Text Information for the Image Logo Link**

i. **Issue:** The image logo link for "Mr & Mrs Crab" contains incorrect alt text that is either missing, empty, or fails to adequately describe the purpose of the link. Screen reader users rely on accurate and descriptive alt text to understand the function of image-based links. Without correct alt text, users are unable to determine the destination or purpose of the link, creating a significant barrier for those who depend on assistive technology to navigate the page.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind or have visual disabilities, the absence of correct alt text on the "Mr & Mrs Crab" logo link renders the link entirely inaccessible through a screen reader. These users are unable to determine where the link leads or what action it performs, effectively excluding them from navigating the site through this element. The logo link

should carry clear, meaningful alt text that conveys both the identity of the brand and the destination of the link — for example, "Mr and Mrs Crab Seafood – Home." Without this, blind users face an insurmountable barrier to independent navigation, undermining their ability to engage with the website on equal terms.

**b. Missing Skip to Main Content Link in the Page**

i. **Issue:** The page does not include a skip navigation link that allows users to bypass repeated navigational elements and proceed directly to the main content. Without this mechanism, keyboard-only users are required to tab through every navigation link on the page each time it loads. Screen reader users are similarly forced to listen to all repeated content before reaching the primary information, significantly impeding efficient and effective page navigation.




ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind and rely on screen readers, the absence of a skip link means that every page interaction begins with a lengthy traversal of repeated navigational content before the main information can be accessed. This places a disproportionate and unnecessary burden on blind users, who must endure repetitive announcements from their assistive technology before reaching the content they seek. A visible skip link — one that becomes apparent upon receiving keyboard focus and allows users to jump directly to the main content area — is essential to ensuring that blind and keyboard-dependent users can navigate the page efficiently, independently, and without unnecessary obstruction.

**c. Missing New Window Indication for Order Now Link**

i. **Issue:** The "Order Now" link opens in a new browser window or tab without providing any prior notification to the user. No visual or programmatic indication is given to inform users of this behavior before the link is activated. This lack of warning creates a disorienting experience for screen reader users and keyboard users, who do not anticipate an unexpected change in browser context, resulting in loss of navigational orientation and confusion during the interaction.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, an unannounced new window or tab opening is particularly disorienting. Without advance notice, blind users suddenly find themselves in an unfamiliar browser

context with no indication of what has changed or how to return to their previous location. This disrupts their navigational flow and can cause significant confusion, as their assistive technology does not automatically communicate the context switch. The link text or its accessible label must explicitly state that it opens in a new window — for example, "Order Now (opens in new window)" — so that blind users can make an informed decision before activating the link and navigate with confidence and clarity.

**d. Missing Visual Labels for Form Fields**

i. **Issue:** The form fields on the page lack visible labels that identify the purpose of each input. Without clearly defined and programmatically associated labels, users are unable to determine what information is required in each field. This absence creates a significant barrier for screen reader users and keyboard users alike, making it impossible to complete the form accurately or efficiently.




ii. **WCAG 2.1 AA Violations:** 3.3.2 - A - Labels Or Instructions

iii. **Impact:** For users who are blind and rely on screen readers, the absence of visible and programmatically associated labels on form fields means that each input field is announced without any meaningful context. Blind users are therefore unable to determine what information is expected of them, rendering the form effectively unusable without sighted assistance. Each form field must have a visible label that is programmatically linked to its corresponding input using the appropriate `for` and `id` attributes. This ensures that screen readers can accurately convey the purpose of each field, enabling blind users to complete forms independently, accurately, and without encountering unnecessary barriers.

**e. Missing New Window Indication for Social Media Links**

i. **Issue:** The social media links on the page open in a new browser window or tab without providing any prior notification to the user. No visual or programmatic indication is given to inform users of this behavior before the link is activated. This lack of warning creates a disorienting experience for screen reader users and keyboard users, who do not anticipate an unexpected change in browser context, resulting in loss of navigational orientation and confusion during the interaction.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, an unannounced new window or tab opening triggered by social media links is particularly disorienting.

Without advance notice, blind users suddenly find themselves in an unfamiliar browser context with no indication of what has changed or how to return to their previous location. This disrupts their navigational flow and can cause significant confusion, as their assistive technology does not automatically communicate the context switch. The link text or its accessible label must explicitly state that it opens in a new window — for example, "Facebook (opens in new window)" — so that blind users can make an informed decision before activating the link and continue navigating with confidence and clarity.

**f. Missing Keyboard Support for the LOCATIONS link**

i. **Issue:** The links present in the "LOCATIONS" section are inaccessible via keyboard navigation and are not properly announced by screen readers. Users who depend on keyboard navigation or assistive technology are unable to reach or meaningfully interact with these links, rendering it impossible to open or explore the Local Favorites content and creating a significant barrier to accessing important information on the page.




ii. **WCAG 2.1 AA Violations:** 2.1.1 - A, 4.1.2 - A - Keyboard

iii. **Impact:** For users who are blind or have motor disabilities and rely on keyboard navigation or assistive technology, the inaccessibility of links in the "LOCATIONS" section creates a complete barrier to engagement. These users are entirely unable to reach, identify, or activate the Local Favorites content, as the links neither receive keyboard focus nor convey meaningful information through screen readers. All links in the "LOCATIONS" section should be reachable using the Tab key and should receive visible focus. Each link should carry a clear and meaningful accessible name so that screen reader users can understand its purpose. Links should also be fully operable using keyboard keys such as Enter or Space, ensuring that all

users can access and interact with the content without obstruction.

**g. Different Link Names but Same Destination**

i. **Issue:** Multiple links, including those labeled "Order Now," "Order Online," and others, direct users to the same destination while using inconsistent and varying link text. This inconsistency fails to communicate to users that these links lead to the same page, causing significant confusion. Because screen reader users frequently navigate by cycling through available links, the presence of differing names for links sharing an identical destination makes it impossible to determine where each link leads, leading users to reasonably but incorrectly assume they are navigating to distinct pages.



ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.4 - AA, 2.4.3 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate exclusively through screen readers, inconsistent link naming for links that share the same destination creates a profound barrier to independent and informed navigation. When links such as "Order Now" and "Order Online" are announced separately without any indication that they lead to the same location, blind users are unable to distinguish intended destinations, may activate the wrong link, or may waste significant time and effort attempting to reconcile the apparent discrepancy. Links that lead to the same destination should use identical or substantially similar text, and that text should clearly describe the link's purpose and destination. Consistent link naming enables screen reader users to navigate efficiently, make informed choices, and avoid unnecessary confusion.

**h. Missing New Window Indication for MERCH Link**

i. **Issue:** The "MERCH," "GIFT CARD," and "FRANCHISE" links open in a new browser window or tab without

providing any prior notification to the user. No visual or programmatic indication is presented before the link is activated, leaving keyboard users and screen reader users entirely unprepared for the resulting change in context. This absence of warning causes users to lose their navigational context unexpectedly, resulting in disorientation and confusion during the browsing experience.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers to navigate web content, the absence of any indication that the "MERCH," "GIFT CARD," and "FRANCHISE" links open in a new window creates a serious and disorienting experience. When a new window or tab opens without warning, blind users lose their place within the original

page and may be unable to determine what has occurred or how to return to their previous context. Users should be clearly informed, both visually and programmatically, when a link will open in a new window or tab. The link text or its accessible label should explicitly state "opens in new window" so that screen readers announce this information prior to activation, allowing all users to make an informed decision before interacting with the link.

**i. Duplicate Focus on Image and Link Text Leading to Same Destination**

i. **Issue:** Images and their associated link text elements — including those for "MERCH," "GIFT CARD," and "FRANCHISE" — each navigate to the same destination but are coded as entirely separate, independent links. As a result, keyboard navigation causes focus to land first on the image link and then again on the associated text link, producing two consecutive focus stops for a single intended action. This redundancy unnecessarily extends the navigation path and creates a significant barrier for

keyboard and screen reader users attempting to move efficiently through the page.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 2.4.4 - A - Focus Order

iii. **Impact:** For users who are blind and navigate using a keyboard and screen reader, encountering duplicate focus stops for links that lead to the same destination — such as those for "MERCH," "GIFT CARD," and "FRANCHISE" — creates a disorienting and inefficient experience. Each redundant focus stop requires additional interaction, forces the user to process repeated announcements for the same destination, and significantly slows the ability to move through page content. When an image and its associated text link share the same destination, they should be combined into a single, unified link element. This ensures

that only one focus stop is presented, that screen readers announce a single, clearly descriptive link name, and that keyboard navigation remains efficient and logical for all users.

**j. Missing Accessible Name for Carousel Slider Dot Buttons**

i. **Issue:** The carousel dot buttons are not assigned accessible names, leaving screen reader users without any meaningful information about the purpose or function of each button. When focus moves to these buttons, no descriptive content is announced, making it impossible for users relying on assistive technology to determine which slide a button corresponds to or how to navigate between slides. This absence of accessible naming constitutes a complete barrier to carousel interaction for screen reader users.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind and depend on screen readers to interact with web content, the absence of accessible names on carousel dot buttons renders the carousel navigation entirely unusable. When no meaningful label is announced upon focus, blind users cannot identify the purpose of each button, determine which slide is currently active, or make informed decisions about which slide to navigate to. Each carousel dot button should be assigned a clear and descriptive accessible name — such as "Go to Slide 1" or "Go to Slide 2" — that is announced by screen readers when the button receives focus. This ensures that blind users can understand, navigate, and control the carousel independently and without confusion.

**k. Slider Content Missing Pause, Stop, and Hide Controls**

i. **Issue:** The slider content advances automatically without providing users any mechanism to pause, stop, or hide its movement. Users who require additional time to read or process the content are unable to control the motion. Screen reader users and keyboard-only users may be unable to interact with the slider before it transitions to the next item.

As a result, users cannot reliably access all content presented within the slider, creating a significant barrier for those who depend on control over moving content.




ii. **WCAG 2.1 AA Violations:** 2.2.2 - A - Pause Stop Hide

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the absence of pause, stop, or hide controls makes it impossible to engage with slider content before it automatically advances. Blind users navigating with assistive technology cannot perceive the movement visually and have no programmatic mechanism to halt it, meaning content disappears before it can be fully read aloud. Keyboard-only users face the same barrier, as they are unable to interact with the slider in time. This denies users equal access to all information presented in the

slider and constitutes a critical barrier to independent use of the interface.

**l. Incorrect Heading Level Defined for the Select a Location Section Elements**

i. **Issue:** Location headings such as "Mr. & Mrs. Crab - Bradenton" and "Mr. & Mrs. Crab - Brandon," among others, do not follow a correct hierarchical order. The page skips heading levels, transitioning directly from H1 to H3 without the inclusion of an H2. This disrupted structure prevents screen reader users from accurately understanding the organization of the page and navigating between sections in a logical and expected sequence.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers to navigate page content, a disrupted heading hierarchy creates a fundamentally disorienting experience. Blind users depend entirely on heading structure to understand how content is organized and to move efficiently between sections without reading every element on the page. When heading levels are skipped, the logical structure of the page collapses, making it impossible for these users to determine how sections relate to one another. This forces blind users to navigate the page linearly and without context, significantly increasing cognitive effort and preventing efficient, independent access to location information.

**m. Duplicate Focus on Image and Button Text Leading to Same Destination**

i. **Issue:** Images and their associated buttons, such as the "Order" text button, navigate to the same destination but are coded as separate interactive elements. When a user navigates using the keyboard, focus is placed on the image first and then again on the associated button text, resulting in repeated navigation steps for a single action. This

unnecessary duplication of focus stops extends the navigation path and creates a significant barrier for keyboard and screen reader users attempting to move efficiently through the page.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 2.4.4 - A - Focus Order

iii. **Impact:** For users who are blind and navigate exclusively using a keyboard and screen reader, encountering two separate focus stops that perform the identical action creates a disorienting and inefficient navigation experience. Blind users cannot visually perceive that the image and the button text are related, so when both are announced as distinct interactive elements leading to the same destination, it causes confusion about the page structure and the number of available actions. This redundancy forces blind users to

expend additional effort to determine whether the two elements are truly distinct, disrupts their understanding of the interface, and significantly slows their ability to reach other content on the page.

**n. Multiple Roles Defined for Order Button**

i. **Issue:** The order button is announced by screen readers as both a link and a button simultaneously. This occurs when incorrect roles or conflicting element types are used in the underlying code. Screen reader users rely on accurate role information to determine how to interact with a control and what outcome to expect. The presence of conflicting roles makes it impossible for users to understand whether activating the control will trigger an action or navigate them to another location.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind and depend entirely on screen readers to interpret interface elements, receiving conflicting role announcements for a single control creates a critical barrier to understanding and interaction. Blind users cannot visually inspect the element to resolve the ambiguity and must rely solely on what the screen reader communicates. When a control is announced as both a link and a button, blind users cannot determine the correct interaction method or anticipate the outcome of activating it. This uncertainty may cause users to avoid the control entirely or activate it incorrectly, denying them equal and independent access to core ordering functionality.

**o. No Feedback After Activation of Add to Cart Button**

i. **Issue:** When a user activates the Add to Cart button, no confirmation or status feedback is communicated to assistive technologies. Screen reader users receive no indication of whether the item was successfully added to the cart or whether an error occurred. This absence of programmatic feedback creates a significant barrier for users who rely on non-visual confirmation to understand the

result of their actions. Without clear feedback, users may repeatedly activate the button, uncertain whether the system has responded.




ii. **WCAG 2.1 AA Violations:** 4.1.3 -AA, 1.3.1 - A - Status Messages

iii. **Impact:** For users who are blind and rely on screen readers to interact with digital interfaces, the absence of status feedback following the activation of the Add to Cart button makes it impossible to confirm whether an action was completed successfully. Blind users have no visual means of observing a change on screen and depend entirely on programmatically exposed status messages to understand system responses. Without this feedback, blind users are left without any indication of success or failure, forcing them to guess whether their action was registered, repeat the action

unnecessarily, or abandon the task altogether. This represents a fundamental barrier to completing a core transactional function of the website independently and with confidence.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about April 19, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing of the barriers to access on April 24, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of

Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for

such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines,

and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

Dated: August 18, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**